# Exhibit B

## IN THE CIRCUIT COURT FOR BALTIMORE COUNTY, MARYLAND

WILLARDA V. EDWARDS, M.D.                    :
5 Colgate Court                              :
Baltimore, Maryland 21228                    :
                                             :        Case No. C-03-CV-22-004561
            Plaintiff                        :
                                             :
v.                                           :
                                             :
AMERICAN MEDICAL ASSOCIATION, INC.           :
A/K/A AMERICAN MEDICAL                       :
ASSOCIATION                                  :
330 N. Wabash Avenue                         :
Suite 39300                                  :
Chicago, Illinois 60611                      :
                                             :
            Defendant.                       :
_____

## COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiff Willarda V. Edwards, M.D., by and through undersigned

counsel, and files this Complaint and sues Defendant American Medical Association, Inc. a/k/a

American Medical Association and in support thereof states as follows:

## INTRODUCTION

Dr. Willarda Edwards sought to become president-elect of the American Medical

Association ("AMA"), the second African American woman to do so in the AMA's history. A

member of the AMA Board of Trustees, Dr. Edwards is eminently qualified to lead the AMA,

and she had enormous support for her candidacy leading up to the June 2022 election.

Just four days before the election, Dr. Edwards was called before the AMA's Election

Campaign Committee without any warning and falsely accused of "vote trading." There was no

semblance of transparency, due process, or basic fairness in the conduct by the Election

Campaign Committee. Dr. Edwards was never provided a copy of the complaint that was

1

allegedly made against her, was never told the specifics of allegations against her, was never told of the complaint's contents or the identity of who made the complaint, and was never provided the alleged evidence against her. She was not given any reasonable notice or opportunity to prepare a defense.

To this day, Dr. Edwards has never been shown the "evidence" against her. The only purported "evidence" is a telephone call, recorded without Dr. Edwards' knowledge or consent by William Reha, M.D. However, the surreptitiously recorded call with Dr. Reha was a set-up designed to thwart her candidacy. Dr. Edwards has unquestionably not engaged in any form of vote trading.

The AMA defamed Dr. Edwards at a general session the day before the election and at a general session immediately preceding the vote. In what was supposed to be the traditional opening session of the AMA House of Delegates and at a session before votes were cast, the AMA instead used the meetings to disparage Dr. Edwards, announcing to all of the delegates present that Dr. Edwards had committed a campaign violation, that her delegation had arranged a "quid pro quo" with another delegation to support Dr. Edwards' candidacy, and that Dr. Edwards took advantage of this arrangement.

The AMA impugned Dr. Edwards with these false charges, which destroyed her candidacy and irreparably damaged her reputation.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to Md. Code Ann., § 6-103 of the Courts and Judicial Proceedings Article ("C.J.P."). Defendant AMA transacts business and performs work and services in the State of Maryland.

2.      Pursuant to C.J.P. § 6-201, venue in Baltimore County is proper. Defendant AMA carries out regular business in Baltimore County. This matter arises in part from the unlawfully recording of Dr. Edwards' phone call while she was at her home in Baltimore County.

## PARTIES

3.      Plaintiff Willarda V. Edwards, M.D. is an adult citizen of the State of Maryland, residing therein at 5 Colgate Court, Baltimore, Maryland 21228. Dr. Edwards is a member of Defendant American Medical Association, currently serving as a member of the Board of Trustees. Over the past 28 years, Dr. Edwards has held a variety of elected and/or appointed positions with the AMA.

4.      Defendant American Medical Association, Inc. a/k/a American Medical Association is a professional association of physicians, residents, and medical students, with its principal place of business and national headquarters located at 515 N. State Street, Chicago, Illinois 60610. AMA is a nonprofit organization.

## FACTUAL BACKGROUND

5.      Dr. Edwards sought the position of president-elect of the AMA in the most recent AMA election. She would have been the second African American woman elected to the position in the AMA's history.

6.      Dr. Edwards knew she wanted to become a doctor from an early age. When she was a teenager, her 15-month-old stepsister tragically died from sickle cell disease. This early loss inspired Dr. Edwards' interest in a career in the medical field.

7.      She also lost her father to lung cancer at the age of 72 and her mother to pancreatic cancer at the age of 61, which further influenced her commitment to the medical field and, in particular, to addressing health care disparities.

3

8.      Dr. Edwards earned her medical degree from the University of Maryland School of Medicine in 1977.

9.      After graduating from medical school, Dr. Edwards served in the U.S. Navy, and was on active duty for four years as an internist at the Annapolis Naval Clinic and Bethesda Naval Hospital.

10.     Following completion of active duty, Dr. Edwards continued to serve the medical needs in the Navy Reserves until retirement at the rank of commander in 1998.

11.     Dr. Edwards began in the private practice of medicine in 1984. She has now practiced as an internist in Baltimore, Maryland for nearly 39 years.

12.      Dr. Edwards has been involved with organized medicine since 1994. She was elected president of both of her local chapters of the AMA and the National Medical Association in 1994. She was the first African-American woman to be elected president of her local AMA chapter, the Baltimore City Medical Society.

13.     Ten years later, she served as president of MedChi, the Maryland State Medical Society.

14.     In 2004, she became president and Chief Operating Officer of the Sickle Cell Disease Association of America.

15.      Dr. Edwards was elected president of the National Medical Association, the nation's largest and oldest African-American medical association, in 2009.

16.     Dr. Edwards has been an early leader nationally in addressing the racial disparities in American healthcare. She served as NAACP national advocacy director and oversaw the creation of the "Call to Action in Health" initiative, which addresses health care disparities.

17.     She has continued this advocacy on the AMA board. In 2016, Dr. Edwards was elected to the AMA board and re-elected in 2020.

18.     Her various leadership roles with the AMA have included serving as the inaugural member and chair of the Women Physicians Congress; serving as Chair of the House of Delegates Committee on Compensation of Officers; serving as the Chair and member of the Council on Constitution and Bylaws; serving as Chair of the Task Force on Health Equity; serving as Chair of the Board Awards and Nominating Committee, and serving as a liaison to AMAF, COL, RFS, CLRPD, WPS, MAS, LGBTQ+ Advisory Committee.

19.     This year, Dr. Edwards was the leading candidate of the AMA Southeastern Delegation for the national AMA president-elect position. She enjoyed strong support throughout the organization for her campaign. She had robust support from the Southeast region, as well as her own state medical society, the American College of Physicians, National Medical Association, and the AMA Minority Affairs Section.

20.     Dr. Edwards was highly likely to become the second-African-American woman president of the AMA until a small group within the AMA improperly conspired to impair her candidacy.

21.     In June 2022, Dr. Edwards was incorrectly advised by colleagues that William Reha, M.D., a urologist who practices in Virginia, had decided not to seek the AMA vice-speakership in 2023 to avoid the appearance of a power grab by the region. This was potentially helpful to Dr. Edwards' campaign because it would reduce the number of candidates seeking national office from the southeast region.  It was suggested to Dr. Edwards that she call Dr. Reha to acknowledge his decision and thank him.

22.     Dr. Reha was not a candidate for any office in the June 2022 national elections.

23.     Dr. Edwards was not involved in any way in what she was told was a decision by Dr. Reha not to seek the AMA vice-speakership, and she had no influence on his decision-making.

24.     Dr. Edwards called Dr. Reha from her home in Maryland on June 6, 2022 at 6:33 p.m. He returned her call one minute later. According to her Verizon phone bill, they had a 13-minute call. When she called, Dr. Reha said "I don't know what Harry told you. I'm putting my card down," referring to another AMA member. He added, "Harry is kind of confused."

25.     Dr. Reha then abruptly steered the conversation to Dr. Edwards' candidacy for president-elect, asking her how his decision to seek the AMA vice-speakership would impact her own candidacy. Dr. Reha's question was odd and awkward. Given the strangeness of his questioning, Dr. Edwards remembers immediately thinking after the call that Dr. Reha must have recorded their conversation but then dismissed the idea, thinking that no fellow physician in the AMA would do such a thing.

26.     Unbeknownst to Dr. Edwards, Dr. Reha was, in fact, surreptitiously tape recording their telephone call.

27.     Dr. Reha plainly prepared to record the phone call with the motive of attempting to find some pretext to interfere with Dr. Edwards' candidacy and create a pretext for a false complaint that Dr. Edwards had committed campaign violations. In retrospect, this question was clearly calculated to draw some statements by Dr. Edwards that he could use later to thwart her candidacy and to benefit her opponent.

28.     The nonconsensual recording of a party's call is a felony in Maryland, where Dr. Edwards was located at the time. Md. Code Ann., Cts. & Jud. Proc. Art. § 10-402(c)(3).  While she was being recorded, Dr. Edwards was located at her residence in Baltimore County,

Maryland, and her words were uttered in Maryland while they were being recorded by Dr. Reha. Dr. Edwards had a reasonable expectation of privacy and absolute legal right to speak from Maryland on her telephone without being recorded by Dr. Reha.

29.     Dr. Reha's whereabouts during the call are unknown to Dr. Edwards. Virginia is a one-party consent state, meaning it is a crime to intercept or record a wire, oral, or electronic communication unless one party to the conversation consents. Illinois is an all-party consent state in certain circumstances, and it is unlawful for a person to knowingly and intentionally record in a surreptitious manner a private conversation. *See* 720 ILCS 5/14-2.

30.     Two-party consent states such as Maryland have created civil liability for the interception, use, or disclosure of intercepted use, including potential criminal and civil liability for subsequent replaying or distribution of the unlawfully intercepted recording. Md. Code Ann., Cts. & Jud. Proc. § 10-410(a). This includes actual damages, punitive damages, and attorneys' fees. *Id.*

31.     The election for the president-elect of the AMA, along with a number of other positions, was scheduled to be held on June 14, 2022 at the annual meeting of the AMA's House of Delegates in Chicago, Illinois.

32.     Dr. Edwards arrived at the AMA annual meeting in Chicago on June 7, 2022, with high hopes and was enjoying enormous support for her candidacy.  This was the day after her telephone call with Dr. Reha.

33.     In-person campaigning began on Friday, June 10, and continued into Saturday, June 11.

34.     On Saturday afternoon, Dr. Edwards had finished a round of 10 or 11 interviews when she was abruptly confronted by the AMA Vice-Speaker, Dr. Lisa Egbert, who asked her to

"come with me right now." Dr. Egbert led Dr. Edwards into a room with three other people, and they were later joined by a fourth, Dr. Roger Brown. Dr. Edwards came to learn that this was the AMA Election Campaign Committee.

35. The members of the Election Campaign Committee immediately began to accuse Dr. Edwards of "vote trading," and questioned her about alleged "vote trading activity." Without providing her any evidence, they claimed to have information that Dr. Edwards was "definitely engaged in vote trading." Dr. Edwards was shocked and had no idea what they were talking about. The Election Committee would not confront Dr. Edwards with any evidence of alleged vote trading.

36. The Election Campaign Committee process resembled a star chamber. There was no semblance of transparency, due process, or basic fairness. At no time did the AMA Election Campaign Committee provide her notice that she was under investigation, a copy of any complaint, or any evidence that they were considering against her.

37. Although the Committee later told the Southeast Region that a "formal complaint" was filed, Dr. Edwards has never seen a formal complaint, does not know its contents, and does not know who made the complaint.

38. Dr. Edwards has not been provided any of the alleged evidence against her. When the Southeast Region requested information about the allegations, the Committee responded that there had been "multiple interviews." Dr. Edwards has no idea who was interviewed, when they were interviewed, or what the interviewees said. She was never given an opportunity to challenge or respond to their statements or even be given any information about what the interviewees said in order to respond. In fact, she was never told the identity of the so-called "witnesses" so she could challenge their credibility, veracity, or the basis of their

purported knowledge.  She had no opportunity to rebut the "evidence" against her because the Election Committee did not provide it to her.

39.     Dr. Edwards was not given reasonable notice or an opportunity to prepare her defense. Importantly, she was given no opportunity to call her own witnesses, including highly respected members of the Southeast Region Delegation who could rebut this false charge.  The Committee considered only charges made by political opponents of Dr. Edwards and gave her no opportunity whatsoever to call her own witnesses.

40.     Dr. Edwards has never seen a "decision" by the Election Campaign Committee. In fact, the only public notice that she has received is that she was pronounced guilty by the AMA leadership at the opening of the House of Delegates on Monday, June 13, 2022.

41.     In retrospect, it has become obvious that the only so-called "evidence" against Dr. Edwards was Dr. Reha's surreptitiously recorded telephone call, although what else the Committee considered is unknown because the AMA has refused to release it.

42.      Dr. Edwards had not engaged in any form of vote trading. The entire matter, including the taping of the phone call, by Dr. Reha, was a set-up to prevent her from becoming the second African-American woman to lead the AMA and the first past president of the National Medical Association to do so.

43.     Although it is clear that Dr. Edwards had not violated any AMA campaign policies, AMA leadership then undertook to defame Dr. Edwards at the two general sessions which preceded the election.

44.     Bruce Scott, M.D., a member of the Board of Trustees and Speaker of the House of Delegates, preceded the regular agenda of the Monday Business Session on June 13, 2022 by reciting an alleged chronology relating to the "election violation" by Dr. Edwards. These

9

statements were defamatory and calculated to damage Dr. Edwards' reputation and destroy her candidacy. They are also contrary to the entire purpose of the AMA election rules, which are designed to guarantee a fair, transparent, and independent process.

45.    Dr. Scott stated right before the meeting began, "It is with a heavy heart that I read the following announcement." He told the delegates that a complaint of a possible campaign violation had been filed with the Election Committee against Dr. Edwards.

46.    Dr. Scott told the delegates that "committee members interviewed the complainant and multiple other individuals said to have knowledge of the circumstances. In addition to conducting multiple interviews, the committee reviewed evidence that was deemed credible and corroborated that a campaign violation did in fact occur."

47.    He told the delegates that, in violation of AMA election rules, members of the Southeast delegation and another delegation had arranged a "quid pro quo," and that "[t]he other delegation would support Dr. Edwards' current candidacy, and Southeast would support a future candidate from the other delegation." He told the delegates that "Dr. Edwards herself acted to take advantage of this arrangement."

48.    Dr. Scott further said that he was presenting the report to the House of Delegates and that "the House—you—are the final arbiter with your votes."

49.    After Dr. Scott's defamatory statements, Dr. Edwards spoke to the House of Delegates—with notice given to her less than an hour before that these false statements were going to be presented at the meeting—and denied any wrongdoing.

50.    On June 13, 2022, MedPage Today published online detailed reporting about Dr. Scott's conduct ("AMA Annual Meeting Marred by Election Charge"). That article included the false and defamatory statements that Dr. Scott had made to the House of Delegates.

51.     In his statement, Dr. Scott delivered an indictment of Dr. Edwards, and essentially the entire Southeast delegation, falsely stating that a "quid pro quo" existed between that delegation and another "unspecified delegation."

52.     Then, Dr. Scott falsely told the AMA House of Delegates that they ultimately had to adjudicate this issue, stating "the House – you – are the final arbiter with your votes."

53.     This, of course, is completely untrue. Dr. Scott made this statement with the plain implication that if one voted for Dr. Edwards, then they are effectively condoning the vote trading violation of AMA rules, having just told the delegates that the evidence "was deemed credible and corroborated that a campaign violation did in fact occur."  There is, of course, no provision in the AMA governing documents making the AMA House of Delegates "the final arbiter" of violations of campaign rules.

54.     Incredibly, this defamatory conduct was repeated the next day to more than 600 delegates just minutes prior to the casting of votes, when Dr. Scott repeated these allegations. Dr. Scott announced that the findings of the Election Committee still stand and that the rumors that the Election Committee had reversed its decision were incorrect. He stated that Dr. Edwards was guilty of vote trading.

55.     There was no opportunity given to Dr. Edwards to rebut these false allegations. The vote for President Elect occurred just minutes after Dr. Scott's defamatory statements. .

56.     The nature of the "evidence" or the identities of the "multiple" witnesses who were allegedly interviewed were not disclosed to Dr. Edwards or the AMA delegates, nor was any other evidence disclosed. Of course, without such evidence, there was no way that AMA delegates could be an "arbiter" of anything. The only "evidence" they had was Dr. Scott's false and defamatory statements about Dr. Edwards.

57.     When the Southeast delegation requested information from the AMA Election Committee, the response it received was that "the sanction for the violation was the announcement to the House."

58.     This is an extraordinary admission. The AMA leadership determined to punish Dr. Edwards by announcing its false conclusion as part of Speaker Scott's opening of the Monday House of Delegate session. The AMA intended to penalize her candidacy. It worked.

59.     The deplorable conduct of House of Delegates leadership, management, Dr. Reha, and others involved represent a shameful chapter in the 175-year history of the American Medical Association. No respected national organization should conduct its elections this way.

60.     The Southeast Delegation made the following report to its membership on July 18, 2022:

> Despite a formal pronouncement just minutes before the start of the House, on both Monday and Tuesday mornings, and all the accompanying rumors and innuendo, Willarda made it into the run-off. We continue to maintain that Willarda was "set up." Certainly, the whole affair lacked any reasonable semblance of due process: neither the charges nor any of the evidence was ever presented for rebuttal as well as any ability for her, or us, to face the accusers. The SED has filed a counter complaint to address this lack of due process as well as the reputational harm to the SED. In addition, we point out that the way the SED operates and runs endorsements, friendships with other national AMA Delegations, and elections has been fully transparent on our web page since 2012 at www.sed-delegation.org.

61.     Despite the defamatory introduction of the Election Committee's specious "charges and findings," Dr. Edwards still made it into the runoffs. But after Dr. Scott's repeated defamatory references to the Election Committee's "findings," the outcome of the runoff election was a foregone conclusion.

62.     Jesse M. Ehrenfeld, M.D., an anesthesiologist from Wisconsin, was elected president-elect of the AMA. He will be sworn-in as president in June 2023.

63.     The AMA deprived its membership of a fair and open election in this case. The charges against Dr. Edwards were deemed "credible" without giving her any opportunity to produce witnesses of her own, to learn the identity of witnesses against her and to confront them, or to produce her own witnesses.

64.     Dr. Edwards has been a national leader in addressing racial disparities in American health care. Ironically, last year, the AMA published a plan to "dismantle" structural racism and to encourage "explicit conversations about power, racism, gender….and forms of discrimination and exclusion."

65.     It is hard to imagine a more vivid example of the use of structural racism to exclude Dr. Edwards from the highest position of the authority within the organization. This sad episode was entirely orchestrated behind-the-scenes with the Speakers and others to sabotage her campaign. Sadly, their plan was successful. The AMA has never treated a candidate who was not a person of color in this fashion.

**COUNT I**
**Defamation**
**(Plaintiff v. Defendant American Medical Association)**

66.     Plaintiff hereby adopts and incorporates by reference all the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

67.     Though it was clear that Dr. Edwards had not violated any AMA campaign policies, AMA leadership, including Dr. Scott, defamed her at the two general sessions preceding the June 14, 2022 election.

68.     At the business session on Monday, June 13, 2022, the day before the election, Dr. Scott announced to all attendees that there was a complaint filed against Dr. Edwards for an "election violation," and he read a chronology related to the alleged violation.

69.     Dr. Scott announced, "Committee members interviewed the complainant and multiple other individuals said to have knowledge of the circumstances. In addition to conducting multiple interviews, the committee reviewed evidence that was deemed credible and corroborated that a campaign violation did in fact occur."

70.     Dr. Scott told the delegates that, in violation of AMA election rules, members of the Southeast delegation and another delegation had arranged a "quid pro quo," and that "[t]he other delegation would support Dr. Edwards' current candidacy, and Southeast would support a future candidate from the other delegation."

71.     He also told the delegates that "Dr. Edwards herself acted to take advantage of this arrangement."

72.     Dr. Scott falsely stated that a "quid pro quo" existed between the Southeast delegation and an unspecified delegation and that Dr. Edwards knew about it.

73.     These defamatory statements were repeated the next day to over 600 delegates just minutes before they cast their votes.

74.     These statements were false and calculated to damage Dr. Edwards' reputation and candidacy. The alleged "evidence" was not credible, there was no campaign violation that actually occurred, there was no "quid pro quo" that had been arranged, there was no agreement that an unspecified delegation would support Dr. Edwards' candidacy in exchange for the Southeast delegation supporting that delegation's future candidate, and Dr. Edwards did not act to take advantage of any such alleged arrangement (nor could she have, given that no such arrangement existed).  At all times mentioned, Dr. Scott made these statements on behalf of the leadership of the AMA, as an officer and agent of the AMA.

75.     Defendant AMA knowingly or recklessly made the false and defamatory statements

76.     Defendant AMA made the statements with actual malice. Defendant AMA acted with, and was motivated by, the knowledge that these statements were false and with the intent to cause harm to Dr. Edwards and to harm her personal and professional reputation, character, and candidacy.

77.     In the alternative, Defendant AMA made these statements with a reckless disregard for the truth or falsity of these statements and with the intent to cause harm to Dr. Edwards and to harm her personal and professional reputation, character, and candidacy.

78.     Plaintiff has suffered damage as a result of Defendant's defamatory statements, including harm to Plaintiff's personal and professional reputation, harm to her opportunities with the AMA, including her candidacy for president-elect, mental anguish, emotional distress, shame, and embarrassment.

WHEREFORE, Plaintiff Willarda Edwards, M.D. sues the Defendant American Medical Association for cause and respectfully request: (a) Judgment against Defendant in an amount exceeding seventy-five thousand dollars ($75,000), plus interest, punitive damages, and costs; and (b) this Court award Plaintiff such other relief as the Court deems just and proper.

**COUNT II**
**False Light**
**(Plaintiff v. Defendant American Medical Association)**

79.     Plaintiff hereby adopts and incorporates by reference all the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

80.     On June 13 and June 14, 2022, AMA leadership, including Dr. Scott, made false and disparaging statements about Dr. Edwards at two sessions attended by hundreds of delegates.

15

81.     AMA leadership, including Dr. Scott, stated that Dr. Edwards determined that Dr. Edwards had engaged in a "campaign violation," that members of the Southeast delegation and another delegation had arranged a "quid pro quo," and that "[t]he other delegation would support Dr. Edwards' current candidacy, and Southeast would support a future candidate from the other delegation."

82.     He also told the delegates that "Dr. Edwards herself acted to take advantage of this arrangement."

83.     Dr. Scott falsely stated that a "quid pro quo" existed between the Southeast delegation and an unspecified delegation.

84.     The AMA improperly publicized false statements about Dr. Edwards, which placed her in a false light by announcing that she had engaged in an election violation, which was false.

85.     The AMA knew that the facts publicized about Dr. Edwards were false or publicized them with a reckless disregard for the truth or falsity of those facts.

86.     The publication of these statements would be highly offensive to any reasonable person.

87.     Defendant made the statements with actual malice. Defendant acted with, and was motivated by, the knowledge that these statements were false and with the intent to cause harm to Dr. Edwards and to harm her personal and professional reputation, character, and candidacy.

88.     In the alternative, Defendant made these statements with a reckless disregard for the truth or falsity of these statements and with the intent to cause harm to Dr. Edwards and to harm her personal and professional reputation, character, and candidacy.

89.     Plaintiff has suffered damage, including special damages, as a result of Defendant's statements, including harm to Plaintiff's personal and professional reputation, harm to her opportunities with the AMA, including her candidacy for president-elect, mental anguish, emotional distress, shame, and embarrassment.

WHEREFORE, Plaintiff Willarda Edwards, M.D. sues the Defendant American Medical Association for cause and respectfully request: (a) Judgment against Defendant in an amount exceeding seventy-five thousand dollars ($75,000), plus interest, punitive damages, and costs; and (b) this Court award Plaintiff such other relief as the Court deems just and proper.

## COUNT III
### Civil Conspiracy
### (Plaintiff v. Defendant American Medical Association)

90.     Plaintiff hereby adopts and incorporates by reference all the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

91.     Plaintiff Dr. Edwards campaigned to be elected president-elect in the most recent AMA elections held in June 2022.

92.     On the day before Dr. Edwards left for Chicago for the annual AMA meeting, she called William Reha, M.D. after being told he was not seeking the vice-speakership in 2023.

93.     During the call on June 6, 2022, Dr. Reha steered the conversation to Dr. Edwards' candidacy for present-elect, and he surreptitiously recorded the telephone call. His questions were clearly calculated, and the call recorded, for the purpose of interfering with her candidacy and benefiting her opponents.

94.     On June 11, 2022, the second day of in-person campaigning, Dr. Edwards was brought before the AMA Election Campaign Committee and confronted with accusations of "vote trading."

17

95.     The Election Campaign Committee did not engage in any transparency, due process, or basic fairness. The Committee did not provide Dr. Edwards notice that she was under investigation and did not provide the alleged evidence against her. She was given no opportunity to prepare a defense or call her own witnesses.

96.     The only alleged "evidence" is the surreptitiously recorded phone call.

97.     It is evident that Dr. Edwards did not engage in any sort of vote trading. The AMA and Dr. Reha were engaged in a coordinated set-up to prevent Dr. Edwards from becoming the second African-American woman and first past president of the National Medical Association to lead the AMA.

98.     Even though Dr. Edwards had not violated any AMA campaign policies, AMA leadership undertook to defame Dr. Edwards at the two general sessions preceding the election.

99.     The AMA determined to punish Dr. Edwards by announcing its false conclusion to the House of Delegates that Dr. Edwards had engaged in vote trading. The AMA and Dr. Reha's purpose was to damage her candidacy.

100.    The AMA and Dr. Reha agreed to join in a common scheme to harm Dr. Edwards' candidacy for president-elect.

101.    The AMA and Dr. Reha were engaged in a conscious effort of planning to damage Dr. Edwards' campaign to prevent her from becoming president-elect.

102.    The conduct of the AMA and Dr. Reha was deliberate, malicious, willful, and intentionally calculated to inflict harm upon Dr. Edwards.

103.    As a result of the AMA's conduct, Dr. Edwards suffered and will continue to suffer damage to her personal and professional reputation and her opportunities with the AMA,

including her candidacy for president-elect, mental anguish, emotional distress, shame, and embarrassment.

WHEREFORE, Plaintiff Willarda Edwards, M.D. sues the Defendant American Medical Association for cause and respectfully request: (a) Judgment against Defendant in an amount exceeding seventy-five thousand dollars ($75,000), plus interest, punitive damages, and costs; and (b) this Court award Plaintiff such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demand a jury trial as to all issues so triable.

Respectfully submitted,

By:  /s/_____
Timothy F. Maloney, CPF#8606010245
Alyse L. Prawde, CPF#1412180033
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 (phone)
(301) 220-1214 (fax)
tmaloney@jgllaw.com
aprawde@jgllaw.com

*Attorneys for the Plaintiff*