IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WILLARDA V. EDWARDS, M.D., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-22-3297 |
| AMERICAN MEDICAL ASSOCIATION, INC., | * | |
| | * | |
| Defendant. | | |

***

# MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant American Medical Association, Inc.'s ("AMA") Motion to Dismiss (ECF No. 10). The Motion is ripe for disposition and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons set forth below, the Court will grant the Motion.

## I.   BACKGROUND[1]

Plaintiff Willarda Edwards, M.D., an African American woman, ran for President of the AMA in 2022. (Compl. at 1, ECF No. 5). Edwards is a member of the AMA's Board of Trustees, is "eminently qualified to lead the AMA, and she had enormous support for her candidacy leading up to the June 2022 election." (Id.). Edwards claims, however, that four days before the election, she was falsely accused of "vote trading" by the AMA. (Id.). Edwards alleges that another physician who was running for Vice Speaker, William Reha, recorded a phone call with her in "a set-up designed to thwart her candidacy." (Id. at 2, 24–

---

[1] Unless otherwise noted, the Court takes the following facts from the Complaint (ECF No. 5) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

25). Ultimately, she alleges that the AMA defamed her at a general session the day before the election and then at another general session immediately before the vote took place. (Id.). She claims further that the AMA used those meetings to disparage her by telling the voting members that she had committed a campaign violation and that she had engaged in a "quid pro quo" with another delegation to support her candidacy. (Id.). Edwards claims these allegations are false. (Id.).

Edwards graduated from the University of Maryland School of Medicine in 1977. (Id. ¶ 8). She then served in the Navy before entering private practice. (Id. ¶¶ 9–11). She has around forty years of experience practicing medicine. (Id. ¶ 11). Edwards became involved with the AMA and the National Medical Association in 1994. (Id. ¶ 12). She was elected president of the National Medical Association in 2009. (Id. ¶ 15). In 2016, Edwards was elected to the AMA Board and has served in numerous leadership roles with the organization. (Id. ¶ 17–18).

Edwards alleges that in June 2022, she was "incorrectly advised" that Reha had decided not to seek the AMA vice-speakership in 2023, which was "potentially helpful" to her campaign because it would reduce the number of candidates running from her region in the Southeast. (Id. ¶ 21). Edwards passively alleges that "[i]t was suggested" that she call Reha to thank him. (Id.). Nonetheless, she claims that she "was not involved in any way" in Reha's supposed decision not to run for the vice-speakership. (Id. ¶ 23).

On June 6, 2022, Edwards called Reha from her home in Maryland. (Id. ¶ 24). Reha returned her call a minute later, and they spoke on the phone for 13 minutes. (Id.). She alleges that Reha said, "I don't know what Harry told you. I'm putting my card down."

(Id.). Edwards does not explain who Harry is or what his involvement was in these events. (Id.). In any event, Edwards alleges that Reha then "abruptly steered" the conversation to Edwards' candidacy and asked how his decision to run for Vice Speaker would affect her candidacy for President. (Id. ¶ 25). Edwards claims that this question was "odd and awkward," and that "[g]iven the strangeness of his questioning," she "immediately [thought] after the call that Dr. Reha must have recorded their conversation." (Id.). Although she initially dismissed the thought, she later learned that Reha had in fact recorded the call. (Id. ¶¶ 25–26).

Edwards alleges that Reha recorded the phone call "with the motive of attempting to find some pretext to interfere with Dr. Edwards' candidacy and create a pretext for a false complaint that Dr. Edwards had committed campaign violations." (Id. ¶ 27). On June 7, 2022, the day after her call with Reha, Edwards went to the AMA's annual meeting in Chicago. (Id. ¶ 32). On June 11, 2022, Edwards was "abruptly confronted" by Lisa Egbert, M.D., the AMA Vice Speaker. (Id. ¶ 34). Egbert told Edwards to "come with [her] right now," and led Edwards into a room with four members of the AMA Election Campaign Committee (the "Committee"). (Id.). Edwards claims that the members of the Committee "immediately began to accuse" her of "vote trading" and asked her about any "vote trading activity." (Id. ¶ 35). They stated that they had information that Edwards had engaged in vote trading, but they did not show her that evidence or notify her that she was under investigation. (Id. ¶¶ 35–36).

After receiving an inquiry regarding the investigation from "the Southeast Region," the Committee stated that a formal complaint had indeed been filed against Edwards. (Id.

¶ 37). The Committee further informed the Southeast Region that it had conducted "multiple interviews" during its investigation. (Id. ¶ 38). Again, Edwards alleges that she does not have information regarding these interviews and could not present her own character witnesses in response. (Id. ¶ 39). Further, she has never seen a formal decision by the Committee. (Id. ¶ 40).

On June 13, 2022, the House of Delegates of the AMA opened session. (Id. ¶¶ 43–44). Edwards alleges that during this session, Bruce Scott, M.D., a member of the Board of Trustees and the Speaker of the House of Delegates, recited a chronology of Edwards' alleged campaign violations. (Id. ¶ 44). Edwards does not offer the Court the contents of this chronology, but instead identifies the following statements by Scott that she alleges were defamatory:

- "It is with a heavy heart that I read the following announcement," before stating that there was a complaint of a possible campaign violation by Edwards before the Committee, (id. ¶ 45);

- Scott told the members of the session that "[C]ommittee members interviewed the complainant and multiple other individuals said to have knowledge of the circumstances. In addition to conducting multiple interviews, the [C]ommittee reviewed evidence that was deemed credible and corroborated that a campaign violation did in fact occur," (id. ¶ 46);

- Scott said that members of the Southeast delegation and another, unspecified delegation had arranged a "quid pro quo," and that "[t]he other delegation would support Dr. Edwards' current candidacy, and Southeast would support

4

a future candidate from the other delegation." Scott further indicated that "Edwards herself acted to take advantage of this arrangement," (id. ¶ 47);

- Finally, Scott said he was "presenting the report to the House of Delegates" and that "the House—you—are the final arbiter with your votes," (id. ¶ 48).

Edwards claims that she was given less than an hour's notice that the statements would be presented at the meeting, but she again does not explain how she received that notice or identify the context surrounding it. (Id. ¶ 49). Regardless, after Scott addressed the delegates, Edwards responded by denying any wrongdoing. (Id.). Edwards alleges that the next day, "this defamatory conduct was repeated" to the over 600 delegates before the casting of votes for presidency of the AMA. (Id. ¶ 54).

Edwards made it to the run-offs in the election, but eventually lost the race. (Id. ¶¶ 61–62). Edwards alleges that the AMA perpetuated structural racism in an attempt to exclude her from the highest position of authority in the organization and that the "AMA has never treated a candidate who was not a person of color in this fashion." (Id. ¶ 65).

On November 9, 2022, Edwards filed suit in the Circuit Court for Baltimore County, Maryland. (Notice Removal ¶ 1, ECF No. 1). In her Complaint, Edwards alleges: defamation (Count I); false light (Count II); and civil conspiracy (Count III). (Compl. ¶¶ 66–103).

On January 18, 2023, the AMA filed a Motion to Dismiss. (ECF No. 10). On February 22, 2023, Edwards filed an Opposition. (ECF No. 14). On March 29, 2023, the AMA filed a Reply. (ECF No. 15).

## II. DISCUSSION

### A. Standard of Review

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012), aff'd, 546 F.App'x 165 (4th Cir. 2013)).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, accept the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. See Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid

6

of any reference to actual events, United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

**B.     Analysis**

    **1.     Defamation and False Light Claims[2]**

Edwards alleges claims for defamation (Count I) and false light (Count II). The AMA argues, among other things, that Edwards' claims fail because she does not plead actual malice in her Complaint and therefore cannot establish the shared, required element of fault. (Def.'s Mem. Supp. Mot. Dismiss ["Mot."] at 4–7, ECF No. 10-1). The Court agrees and will dismiss Counts I and II.

In Maryland, to make a prima facie case of defamation, "a plaintiff must establish that (1) the defendant made a defamatory statement to a third person (a requirement known as publication); (2) the statement was false; (3) the defendant was legally at fault in making the statement; and (4) the plaintiff thereby suffered harm." Doe v. Johns Hopkins Health Sys. Corp., 274 F.Supp.3d 355, 365 (D.Md. 2017); see also McGreal v. AT&T Corp., 892 F.Supp.2d 996, 1016 (N.D.Ill. 2012) (stating that defamation under Illinois law requires the plaintiff to show fault by the defendant). To successfully plead false light, a plaintiff must show:

> 1) [T]hat the defendant gave "publicity to a matter concerning another that places the other before the public in a false light,"

---

[2] As a federal court sitting in diversity, this Court is obligated to apply Maryland's choice of law rules. Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007). Here, as the parties apply both Illinois and Maryland law in their analyses, the Court will utilize law from both jurisdictions.

>  2) that "the false light in which the other person was placed would be highly offensive to a reasonable person," and 3) that "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

Barnhart v. Paisano Publ'ns, LLC, 457 F.Supp.2d 590, 594 (D.Md. 2006); see also Osumdairo v. Glandian, 591 F.Supp.3d 353, 357 (N.D.Ill. 2022) (indicating that a false light claim under Illinois law requires a showing of "actual malice").

"Establishing the third element, that a defendant is legally at fault, requires a showing that, at a minimum, the party making the false statement acted negligently." Johns Hopkins Health Sys. Corp., 274 F.Supp.3d at 366. But the AMA argues that an even higher standard applies here because the allegedly defamatory statements are covered by a conditional privilege, the common interest privilege, which requires a showing of actual malice and not mere negligence. (Mot. at 5). At bottom, the Court agrees.

"There are . . . circumstances in which a person will not be held liable for a defamatory statement." Woodruff v. Trepel, 725 A.2d 612, 617 (Md.Ct.Spec.App. 1999). In Maryland, courts have acknowledged that "a person ought to be shielded against civil liability for defamation where, in good faith, he publishes a statement in furtherance of his own legitimate interests, or those shared in common with the recipient or third parties." Doe v. Salisbury Univ., 123 F.Supp.3d 748, 758 (D.Md. 2015) (quoting Gohari v. Darvish, 767 A.2d 321, 328 (Md. 2001) (cleaned up)). The Court of Appeals of Maryland has explained:

> The common law conditional privileges rest upon the notion that a defendant may escape liability for an otherwise actionable defamatory statement, if publication of the utterance

8

> advances social policies of greater importance than the vindication of a plaintiff's reputational interest. Specifically, the common law recognized that a person ought to be shielded against civil liability for defamation where, in good faith, he publishes a statement in furtherance of his own legitimate interests, or those shared in common with the recipient or third parties, or where his declaration would be of interest to the public in general.

Gohari, 767 A.2d at 328 (quoting Marchesi v. Franchino, 387 A.2d 1129 (Md. 1978)). Maryland courts have cited four different qualified privileges that exist at common law:

> (1) The public interest privilege, to publish materials to public officials on matters within their public responsibility; (2) the privilege to publish to someone who shares a common interest, or, relatedly, to publish in defense of oneself or in the interest of others; (3) the fair comment privilege; and (4) the privilege to make a fair and accurate report of public proceedings.

Id. (quoting Prosser, The Law of Torts § 413).

The AMA asserts that the common interest privilege applies here. Under the common interest privilege:

> An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know.

Id. (quoting Hanrahan v. Kelly, 305 A.2d 151, 156 (Md. 1973)). The privilege is intended "to promote free exchange of relevant information among those engaged in a common enterprise or activity and to permit them to make appropriate internal communications and share consultations without fear of suit," and it may be "lost if it is abused by malice." Id. (quoting The Law of Torts § 414). Common interests may include "interests in property, business and professional dealings." Id. Once a defendant is able to show that a qualified

9

privilege applies, the burden shifts to the plaintiff to show actual malice in order for his claim to survive. Hanrahan, 305 A.2d at 156.

Here, the facts in the Complaint, which the Court accepts as true, demonstrate that the common interest privilege applies. The AMA engaged in an investigation to determine whether one of the candidates for its highest role participated in acts that violated their election rules. As Edwards alleges, Scott informed her that the AMA received a complaint of a possible campaign violation, conducted multiple interviews with "individuals said to have knowledge of the circumstances," and "reviewed evidence that was deemed credible" before "corroborat[ing] that a campaign violation did in fact occur." (Compl. ¶¶ 45–46). Even if Edwards questions the legitimacy of the Committee's investigation or otherwise believes that the investigative process was unfair to her, the Court finds that Scott's communications to the House of Delegates regarding the Committee's findings were made in the common interest. At least for purposes of determining whether a privilege exists, the statements were aimed at protecting AMA's election process by providing the delegates with facts that they might be reasonably entitled to know—that one of the candidates for presidency of the national organization allegedly engaged in improper vote trading through an alleged quid pro quo between regional delegations. (Id. ¶ 47). Accordingly, as the Court finds the common interest privilege applies to Scott's allegedly defamatory statements, Edwards must plead actual malice for her claims to survive. See Hanrahan, 305 A.2d at 156; Gohari, 767 A.2d at 328.

Edwards has failed to allege that the AMA made any statements with the malice necessary to defeat the common interest privilege. Actual malice is "defined as a person's

10

actual knowledge that his statement is false, coupled with his intent to deceive another by means of that statement." Salisbury Univ., 123 F.Supp.3d at 758 (quoting Piscatelli v. Van Smith, 35 A.3d 1140, 1148 (Md. 2012) (cleaned up)). "While malice is usually a question for the fact-finder, it need not be submitted to the fact-finder when the plaintiff fails to allege or prove facts that would support a finding of malice." Id. at 761 (quoting Piscatelli, 35 A.3d at 1148). In her Complaint, Edwards offers only the following conclusory statement as to malice, "Defendant AMA made the statements with actual malice. Defendant AMA acted with, and was motivated by, the knowledge that these statements were false and with the intent to cause harm to Dr. Edwards and to harm her personal and professional reputation, character, and candidacy." (Compl. ¶¶ 76, 87). She does not identify any facts in support of this boilerplate recitation of the pleading requirements, and thus her defamation and false light claims must fail. Salisbury Univ., 123 F.Supp.3d at 761 (finding that plaintiffs failed to allege malice where they "deliver[ed] a bare recitation of the legal standard for malice" and offered only "naked assertions").

Accordingly, as the AMA's alleged statements are covered by a conditional privilege, and because Edwards fails to allege specific facts that could support a finding of actual malice, Edwards' claims for defamation (Count I) and false light (Count II) must be dismissed.[3]

---

[3] The AMA raises alternative grounds for the application of the actual malice standard—namely, that Edwards is a limited-purpose public figure and she requests punitive damages in her Complaint. (See Mot. at 10–16). As the Court has already found a conditional privilege applies, it need not address the AMA's alternative grounds for requiring the heightened fault standard. See Horne v. WTVR, LLC, 893 F.3d 201, 210 n.5

11

### 2. Civil Conspiracy

Finally, Edwards asserts a claim for civil conspiracy. (Count III). A civil conspiracy is "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or means employed must result in damages to the plaintiff." Ark. Nursing Home Acquisition, LLC v. CFG Cmty. Bank, 460 F.Supp.3d 621, 647 (D.Md. 2020) (quoting BEP, Inc. v. Atkinson, 174 F.Supp.2d 400, 408 (D.Md. 2001)). There is no distinct tort for civil conspiracy; rather, "a civil conspiracy theory merely serves to extend liability to the co-conspirators after some other tortious conduct is established." Id. Pleading civil conspiracy in a separate count "as if it were a 'cause[] of action independent of an underlying tort'" is improper. Id. (quoting Manikhi v. Mass Transit Admin., 758 A.2d 95, 110 n.6 (Md. 2000)). Here, as Edwards has no remaining claims on which to attach her civil conspiracy claim, the Court will dismiss Count III.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Defendant American Medical Association, Inc.'s Motion to Dismiss (ECF No. 10). A separate Order follows. Entered this 11th day of September, 2023.

/s/<br>
George L. Russell, III<br>
United States District Judge

---

(4th Cir. 2018) (declining to address limited-purpose public figure arguments after finding a conditional privilege applied).